UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 3:18-cr-179-J-32MCR

JAMES THOMAS BUTLER, II
_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress

Evidence from Unlawful Search ("Second Motion to Suppress") (Doc. 72) and the

Government's Response in Opposition thereto (Doc. 77).  The Court held an

evidentiary hearing on the Second Motion to Suppress on January 15, 2020.  For

the reasons stated herein, it is **RECOMMENDED** that Defendant's Second

Motion to Suppress be **DENIED**.

### I.     Background

In a two-count Indictment, Defendant, James Thomas Butler, II ("Butler"),

is charged with (1) inducing, persuading, coercing, etc., a minor to engage in a

sexually explicit conduct for the purpose of producing visual depictions of such

conduct in violation of 18 U.S.C. §§ 2251(a) and (e); and (2) possession of a

black Samsung smart phone containing visual depictions of a minor engaging in

_____

[1] "Within 14 days after being served with a copy of [this Report and
Recommendation], a party may serve and file specific written objections to the proposed
findings and recommendations."  Fed.R.Crim.P. 59(b)(2); *see also* 28 U.S.C. §
636(b)(1); M.D. Fla. R. 6.02(a).  "A judge of the court shall make a de novo
determination of those portions of the report or specified proposed findings or
recommendations to which objection is made."  28 U.S.C. § 636(b)(1).

sexually explicit conduct in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). (Doc. 19.)

On March 4, 2019, Defendant filed his First Motion to Suppress, pursuant to Fed.R.Crim.P. 12(b) and the Fourth and Fifth Amendments to the United States Constitution, seeking to suppress "any images, photographs, videos or other data obtained from a Samsung smart phone seized on May 2, 2018, as well as any statements made by [him] on May 2, 2018, after law enforcement agents illegally seized him and the phone without a warrant and then interrogated him without advising him of his Miranda rights." (Doc. 37 at 1.) The undersigned held evidentiary hearings on the First Motion to Suppress on March 27, 2019 and April 9, 2019, and on June 12, 2019 entered a Report and Recommendation that Defendant's First Motion to Suppress be denied. (Doc. 56.)

Specifically, in the June 12, 2019 Report and Recommendation, the undersigned determined that on May 2, 2018, Defendant voluntarily gave the phones in his possession to the FBI agents and consented to their search. (*Id.* at 54-55, 57.) Moreover, "Defendant never revoked his consent to search the devices." (*Id.* at 57.) Also, "Defendant was not in custody when he was interviewed by the agents and handed [over] his phones," there was "no evidence of coercive police procedure and Butler was fully cooperative throughout the encounter." (*Id.*) In addition, Defendant "confirmed at his probation violation hearings [that took place on June 7, 2018 and August 27,

2018] that he voluntarily consented to the search of the devices" on May 2, 2018.

(*Id.* at 58; *see also id.* at 27 & n.23, 31, 61.)

The June 12, 2019 Report and Recommendation also stated:

> [I]t is immaterial that the smart phone and the tablet belonged to Defendant's mother, given that they were in his possession, he had used them routinely, sometimes for over a month, and apparently he had common authority over them.  (*See* Gov's Ex. 2A at 16; II Tr. 98-100.)  The law is clear that "[v]alid consent may be granted by a person with actual or apparent authority to give permission to search."  *Watkins*, 760 F.3d at 1279.  Here, Defendant testified that he had work contacts in the smart phone; he used it for phone calls, messages, and pictures; and he accessed the internet on it, apparently without any restrictions from his mother.  (I Tr. 70-71; II Tr. 97-100.)  Essentially, as of May 2, 2018, Defendant had constructive possession of the smart phone, which had been used to access the internet and to view pornographic material.  (Gov's Ex. 2A at 18.)  As such, his consent to search the smart phone was valid.  *Watkins*, 760 F.3d at 1279-80, 1282.

(*Id.* at 59.)

In conclusion, the June 12, 2019 Report and Recommendation stated:

> Here, the testimony shows that before taking any devices and before searching any devices, [Special Agent] Privette consistently asked for Defendant's consent, which was enough to put Defendant on notice that he could decline the search of the devices.  Further, Defendant does not contend that his "age, education, or intelligence mitigated his ability voluntarily to consent to the search."  *Id.* at 1241.  In fact, at the evidentiary hearing before this Court, defense counsel did not dispute his client's intelligence, which was confirmed by his work history, education, and overall demeanor.  (II Tr. 121.)  Thus, in analyzing the totality of the objective circumstances of this case, the undersigned determines that Defendant's consent to search the devices in his possession was given freely and voluntarily, and was the product of his "free and unconstrained choice."  *Zapata*, 180 F.3d at 1241.

(*Id.* at 62-63.)

On August 20, 2019, Judge Corrigan entered an Order, adopting the June

12, 2019 Report and Recommendation and denying Defendant's First Motion to

Suppress. (*See* Doc. 66.) On September 10, 2019, Defendant moved to

continue the status conference and the trial in order to give his counsel an

opportunity to review the forensic reports related to the examination of the smart

phone and possibly conduct an independent forensic examination of that phone.

(Doc. 67 at 1-2.) Defendant's unopposed motion for continuance stated, in

relevant part:

> [T]here are two issues related to the seizure of the [smart] phone
> which may not have been fully developed in the earlier [evidentiary]
> hearings, in part, because the evidence at the hearing[s] helped with
> an understanding of these issues. . . . The first concerns the scope
> of the consent search. Without re-litigating whether Mr. Butler
> consented to the search of his mother's phone at the scene, and,
> conceding for purposes of discussion, that the examination by the
> agents provided reasonable suspicion or probable cause to seize it,
> the subsequent search of the contents of the phone by an FBI
> forensic specialist or anybody else without a warrant exceeded the
> scope of any consent given. The second question concerns the
> search of Mr. Butler's room. There were papers seized from the
> room suggesting a connection between the underage person Mr.
> Butler is alleged to have communicated with on the phone which
> was seized. Evidence at the hearing revealed, at least to Mr.
> Butler's counsel, that the property which was the target of the search
> warrant was a multi-dwelling structure. In short, Mr. Butler's private
> and separate room inside the house was not properly the subject of
> the warrant. Mr. Butler anticipates filing motions to suppress on
> these two topics.

(*Id.* at 2.)

On September 13, 2019, Judge Corrigan granted Defendant's unopposed

motion for continuance and reset the status conference for January 21, 2020 and

the trial for the trial term commencing February 3, 2020.  (Doc. 68.)

Subsequently, Defendant retained new counsel, and, on December 11, 2019, he

filed his Second Motion to Suppress, which is currently pending before the Court.

(*See* Docs. 69, 70, 71, 72.)  In the Second Motion to Suppress, Defendant seeks

"to suppress all evidence including the derivative evidence discovered following

the September 21, 2018 warrantless search of the Samsung Galaxy smart phone

seized from Defendant on May 2, 2018."  (Doc. 72 at 1.)  After receiving the

Government's Response, the undersigned held an evidentiary hearing[2] on the

Second Motion to Suppress on January 15, 2020.  (Docs. 77, 78, 84.)  A status

conference is currently set for April 20, 2020, and the case is set for trial for the

trial term commencing May 4, 2020.  (Doc. 83.)

## II.    Evidence Presented at the January 15, 2020 Hearing

### A.    Exhibits

The Court admitted the following exhibits into evidence:

- Government's Exhibit 1 (an FBI chain of custody form for the
  Samsung smart phone obtained from Defendant on May 2, 2018);

- Government's Exhibit 2 (a Criminal Complaint filed against
  Defendant on October 1, 2018);

- Government's Exhibit 3 (an Application for a Search Warrant for
  Defendant's residence on October 1, 2018); and

---

[2] The transcript of this third evidentiary hearing (cited as "III Tr." followed by the appropriate page number) was filed on January 27, 2020.  (Doc. 84.)

- Government's Exhibit 3A (a Search and Seizure Warrant for Defendant's residence on October 1, 2018).

(*See* Docs. 78, 81, 84.)

### B.    Testimony

### 1.    Forensic Examiner Christina Polidan[3]

The Government presented the testimony of Christina Polidan, a forensic examiner with the Federal Bureau of Investigation ("FBI").  (III Tr. 6.)  On May 2, 2018, Ms. Polidan participated in the execution of a search warrant for the residence at 8945 Old Kings Road, Jacksonville, Florida, where Butler and other individuals resided.  (III Tr. 8, 17.)  That day, a black Samsung SM-G935A smart phone was obtained from Defendant with his consent.  (III Tr. 9, 18.)  After the agents took possession of the smart phone on May 2, 2018, they placed it into the FBI's evidence control room in Jacksonville.  (III Tr. 19-20; Gov's Ex. 1.)

Ms. Polidan understood that Defendant had consented to a search of the smart phone.  (III Tr. 10, 18, 23-25.)  Also, she understood that Defendant did not limit his consent in any way and did not revoke his consent at any point in time:

> Q      . . . So it was your understanding based upon what you read in the case file that Mr. Butler had consented to allow you to search the phone in any way, shape, or form you felt appropriate?
> A      Correct.  It was consent to the black Samsung smart phone.
> Q      And you believe that that consent was still standing over – still in effect at the time you did your search?
> A      Correct.  . . .  I was never told he had revoked consent.

---

[3] On the Government's oral motion, the Court found Ms. Polidan to be an expert in the area of forensic examination.  (III Tr. 14; Docs. 79, 80.)  Currently, Ms. Polidan is a certified forensic examiner.  (III Tr. 7.)

(III Tr. 24.)

On May 7, 2018, Ms. Polidan took custody of the smart phone by checking it out of the evidence control room and bringing it to the Computer Analysis Response Team ("CART") lab so she could perform an extraction of the device. (III Tr. 9-10, 20, 22; Gov's Ex. 1.)  On June 26, 2018, Ms. Polidan completed a logical extraction of the smart phone.[4]  (III Tr. 12, 22.)  She explained to the Court that a logical extraction is a "very basic extraction"; it is what the user can see – "text messages, videos, calendar, call logs," etc.  (III Tr. 12-13.)  A physical extraction, on the other hand, "is a much more detailed extraction" that "can get information such as deleted items, file system information," and even "data from third-party applications."  (III Tr. 13.)  On August 15, 2018, Ms. Polidan conducted a physical extraction of the smart phone.  (*Id.*)

Once Ms. Polidan completed the extractions, she uploaded the content of the smart phone to the secure FBI network, which allowed the case agent (Abbigail Beccaccio) to access the data at her own station.  (III Tr. 15, 21.)  Ms. Polidan and Special Agent Beccaccio ("SA Beccaccio") communicated about the contents of the smart phone on several occasions in August and September of

---

[4] Ms. Polidan explained that the delay between the seizure of the phone and its extraction was due to backlog.  (III Tr. 22 ("At the time of the seizure of this evidence item it was myself and one other forensic examiner who was covering all of North Florida, including the [P]anhandle.  We were just a little backlogged and it just took some time."), 23.)  However, during this time, Ms. Polidan remained in constant communication with the case agent.  (III Tr. 23.)

2018.  (III Tr. 15-16.)  On September 13, 2018, Ms. Polidan returned the smart phone back to the Jacksonville evidence control room.  (III Tr. 10, 16; Gov's Ex. 1.)

## 2.    Special Agent Abbigail Beccaccio

The Government next presented the testimony of SA Beccaccio who has been with the FBI since May of 2012.[5]  (III Tr. 25.)  Currently, SA Beccaccio works as a behavioral analysis field coordinator on the Jacksonville evidence response team for violent crimes against children.  (III Tr. 27.)  She is also certified as an online covert employee.  (*Id.*)

SA Beccaccio testified that on May 2, 2018, a Samsung smart phone was consensually obtained from Defendant and then placed into the FBI's evidence control room in Jacksonville.  (III Tr. 30-32; Gov's Ex. 1.)  The chain of custody form did not indicate for how long the smart phone would be retained by the FBI.  (*See* Gov's Ex. 1 ("Retention: Missing"); III Tr. 32 ("Missing just denotes that we do not have a final disposition on this item of evidence in terms of how long we plan on retaining it.  . . .  It means that the length of time that the FBI plans on retaining that piece of evidence, that block of pertinent data is missing.").)  After Ms. Polidan returned the smart phone to the Jacksonville evidence control room on September 13, 2018, Megan Hammerling (a staff operations specialist,

---

[5] Previously, SA Beccaccio was employed by the Orlando Police Department for approximately eight years where her last position was that of a supervisor of forensic imaging and video enhancement.  (III Tr. 26.)

embedded intel worker) checked it out on September 27, 2018, and returned it back to the Jacksonville evidence control room on October 3, 2018.  (III Tr. 33; Gov's Ex. 1.)

On September 21, 2018, SA Beccaccio reviewed, for the first time, the content of the smart phone, which had been uploaded by Ms. Polidan.  (III Tr. 34.)  SA Beccaccio and Ms. Polidan maintained regular communication: first, about the delay in performing the logical extraction of the smart phone; then, about Ms. Polidan's intent to perform a more extensive, physical extraction; and, finally, about the content that had been discovered.  (III Tr. 35.)

During this process, SA Beccaccio was also "in fairly constant communication" with SA Privette.  (III Tr. 36.)  SA Beccaccio knew that Defendant had given his consent to SA Privette to search the smart phone (III Tr. 40, 43-45), she understood it was "complete consent" (III Tr. 40-41), and she never heard about Defendant revoking his consent.  (III Tr. 35-36, 43-44 ("Mr. Butler would have contacted the office and either myself or Special Agent Privette.  Special Agent Privette, having heard a revocation, would have contacted me immediately.  . . .  I believe Mr. Butler was advised that we were agents out of the Jacksonville FBI office.  And it's my understanding that Special Agent Privette also met at least once, possibly twice, following that May date in the presence of Mr. Butler.").)

Based on the content that was discovered as a result of the extractions, on October 1, 2018, SA Beccaccio applied for a federal search warrant for

9

Defendant's new residence at 2916 Apache Avenue, Jacksonville, Florida, attaching a Criminal Complaint against Defendant for production and attempted production of child pornography for the period January 21, 2018 to April 30, 2018.  (Gov's Exs. 2 & 3.)  The warrant was issued that same day.  (Gov's Ex. 3A.)

### 3.    Defendant James T. Butler, II

Defendant also testified at the January 15, 2020 hearing.  Defendant testified that after he handed the smart phone to the agents on May 2, 2018, he was arrested and placed in the Duval County jail, where he was not allowed to call anyone who would not accept collect calls.  (III Tr. 49-50; *see also* III Tr. 50 ("[T]here is no Yellow Pages or White Pages available to you.  You get a list of bondsmen, and that's it unless you know a phone number off your head.").)  Defendant apparently remained in state custody through his probation violation hearings that took place on June 7, 2018 and August 27, 2018.[6]  (*See* II Tr. 16-18.)  Defendant further testified that he was not aware that the agents were going to perform a forensic examination of the smart phone and that nobody informed him as to how he could have revoked his consent to the search.  (III Tr. 50; *see also* III Tr. 50-51 ("[A]ll I wanted to do was go to work, and having that phone was

---

[6] The exact date of Defendant's release from state custody is not apparent from the record before the Court, but it is clear that he was released pursuant to Judge Anderson's August 24, 2018 Order, which directed an amended judgment and sentence be entered to reflect that Defendant was entitled to credit for time served previously awarded plus an additional 292 days credit for time served.  (*See* III Tr. 51; II Tr. 16-18.)

paramount to the things I had to do at work.  I would have never consented for the phone to be taken away from me.  A cursory review was all that was asked for.").)

### III.   Discussion

#### A.   The Parties' Arguments

Defendant argues that there is no reasonable explanation for the FBI agents' failure to seek a search warrant prior to searching the smart phone, which was in their custody since May 2, 2018.  He adds that had a warrant been obtained, it could have limited the scope of the search.

The Government responds that it was not necessary to obtain a search warrant because Defendant voluntarily handed the smart phone to the agents on May 2, 2018 and consented to its search.  Moreover, since Defendant never revoked his consent, the Government argues, any alleged delay in examining the contents of the smart phone did not unreasonably interfere with Defendant's possessory interest in the device.  Even assuming Defendant had revoked his consent, the Government states that such revocation would have had legal implications only if it happened prior to June 26, 2018 (the date of the logical extraction of the smart phone); after that date, Defendant no longer retained a reasonable expectation of privacy in the contents of the phone.

#### B.   Analysis

The undersigned recommends that Defendant's Second Motion to Suppress be denied.  First, to the extent Defendant suggests or implies that his

consent for the search of the smart phone was invalid, limited, and/or revoked, his argument is rejected.  As the Court has already determined, on May 2, 2018, Defendant voluntarily gave the phones in his possession to the FBI agents and consented to their search, his "consent to search the devices in his possession was given freely and voluntarily, and was the product of his 'free and unconstrained choice,'" "his consent to search the smart phone [in particular] was valid," and, significantly, he "never revoked his consent to search the devices". (Doc. 56 at 54-55, 57, 59, 62-63.)

Although Defendant testified at the April 9, 2019 evidentiary hearing before this Court and at the two probation violation hearings on June 7, 2018 and August 27, 2018, he did not argue until now that his consent was somehow limited or that he wished to revoke it.  Instead, at his probation violation hearings, Defendant confirmed that "he voluntarily consented to the search of the devices" on May 2, 2018, and did not mention anything about revoking or limiting his consent.  (*Id.* at 58; *see also id.* at 27 & n.23, 31, 61.)  When Judge Corrigan adopted the Report and Recommendation on Defendant's First Motion to Suppress, these findings became the law of the case.  *See United States v. Montos*, 421 F.2d 215, 221 (5th Cir. 1970), *cert. denied*, 397 U.S. 1022 (1970).

Having obtained Defendant's valid consent for the search of the smart phone, the agents did not need to obtain a warrant before commencing its search.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and

probable cause is a search that is conducted pursuant to consent."); *United States v. Thomas*, 818 F.3d 1230, 1239-40 (11th Cir. 2016) (stating that "a warrantless search is lawful when a person with actual or apparent authority voluntarily consents to law enforcement officers conducting a search"); *United States v. Whaley*, 415 F. App'x 129, 133 (11th Cir. 2011) (per curiam) ("A [search] warrant is not needed . . . if the defendant voluntarily consents to the search."); *United States v. Vallimont*, 378 F. App'x 972, 973 (11th Cir. 2010) (per curiam) ("In most circumstances, *unless there is consent*, police officers must obtain a warrant supported by probable cause to justify a search under the Fourth Amendment.") (emphasis added); *United States v. Emanuel*, No. 1:09-CR-393-CAP-LTW, 2010 WL 11507306, *9 (N.D. Ga. Apr. 19, 2010) (report and recommendation adopted by 2010 WL 11520592 (N.D. Ga. June 3, 2010)) ("Defendant has not presented any case law indicating that law enforcement is required to obtain a search warrant once valid consent has been given. Furthermore, this Court agrees with other courts which have concluded that when law enforcement officers obtain valid consent from a defendant prior to seizing and searching a computer, the officers have no duty to obtain a warrant. . . . Indeed, it is well-settled that consent is a valid exception to the warrant requirement.").

Further, Defendant did not place any explicit limitation on the scope of the search. "The scope of a defendant's consent is judged according to a standard of objective reasonableness. The question is what a police officer could

13

reasonably interpret the consent to encompass."  *Whaley*, 415 F. App'x at 133

(internal citations and quotations omitted); *see also United States v. Megahed*,

No. 8:07-cr-342-T-23MAP, 2009 WL 722481, *2 (M.D. Fla. Mar. 18, 2009) (citing

*Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).  Applying this objective

reasonableness standard, the district court in *Al-Marri* explained:

> Viewed objectively from the perspective of the agents, it was
> reasonable for Zambeck and Brown to have understood that this
> unrestricted grant of access, combined with Al-Marri's expertise in
> computer technology and his helpful attitude in handing the laptop
> over, indicated that Al-Marri had no qualms about an extensive
> search of his computer. . . .  If Al-Marri had any need for use of the
> computer, or felt any reservation or objection about the FBI's
> prolonged retention of it, a reasonable person would have expected
> Al-Marri to ask for the computer to be restored to him within a
> specified time frame for whatever reason justified a prompt return.
> Al-Marri's silence on this subject and his failure to raise the issue
> again the next day persuades this Court that his consent could
> reasonably have been understood to be open-ended and given
> without a limitation on time or scope.

*United States v. Al-Marri*, 230 F. Supp. 2d 535, 540 (S.D.N.Y. 2002).

Here, Defendant never requested the return of the smart phone.  *See*

*Emanuel*, 2010 WL 11507306 at *9 ("Defendant never notified Detective Allen or

anyone at the Atlanta Police Department to advise them that he wanted his

computer returned."); *see also New Hampshire v. Stacey*, 171 N.H. 461, 466

(N.H. 2018) (stating that there was "no evidence that the defendant ever asserted

a possessory claim in the vehicle, either by inquiring on the status of the seizure

or by seeking assurance of the vehicle's return" and noting that there was no evidence that the vehicle's actual owner objected to its seizure).[7]

Defendant now contends that he had no way of contacting the agents to seek the return of the smart phone because he was in custody since his arrest on May 2, 2018. As an initial matter, the undersigned is unpersuaded that a person with Defendant's intelligence and experience would not know how to reach the agents. S*ee Emanuel*, 2010 WL 11507306 at *9 ("Given this Defendant's education and intelligence, the Court finds that if he had wanted to revoke his consent, he could have found a number of ways to do so including, but not limited to calling a receptionist and asking for Detective Allen, or sending a letter."). Moreover, there was testimony at the April 9, 2019 hearing that the FBI agents gave Butler a card with their contact information and informed him that if his mother wanted her smart phone back, she could contact them. (*See* Doc. 56 at 29 n.25 (citing II Tr. 61).) Defendant apparently forgot this detail.

However, even accepting Defendant's contention that he had no way of reaching the agents, Defendant still does not (and cannot) argue that he could have used the device while in custody. *See United States v. Shaw*, 531 F. App'x 946, 949 (11th Cir. 2013) (per curiam) ("Shaw was in custody throughout the contested delay and concedes he could not have physically possessed the

---

[7] Here, the FBI agents gave Butler a card with their contact information and advised him that if his mother (the owner of the smart phone) wanted her device back, she could contact them. (*See* Doc. 56 at 29 n.25 (citing II Tr. 61).) There is no evidence that she did.

phones[.]"); *United States v. Brantley*, No. 1:17-cr-77-WSD, 2017 WL 5988833, *2 (N.D. Ga. Dec. 4, 2017) ("Brantley, having been arrested and detained, was not deprived of access to and use of the seized cellular telephones, because he was in custody, and he does not contend he was allowed possession of a cell phone while detained."); *United States v. Covington*, No. 1:16-CR-145-TWT-JKL-15, 2017 WL 10410076, *7 (N.D. Ga. Oct. 5, 2017) (report and recommendation adopted by 2018 WL 5016499 (N.D. Ga. Oct. 16, 2018)) ("Covington has been in custody since his arrest on May 3, 2016, and he makes no argument that he could have made use of the phones while in custody.").  According to Defendant's own testimony, he was using this particular device primarily for taking photographs at work (*see* II Tr. 97-98), but he was away from any work until at least the end of August of 2018, and by that time the logical and the physical extraction of the device had already been completed.

Even assuming that Defendant had revoked his consent, such hypothetical revocation would have had legal implications only if it occurred prior to June 26, 2018 (the date of the logical extraction), because after that date, Defendant no longer retained a reasonable expectation of privacy in the contents of the smart phone.  *See Megahed*, 2009 WL 722481 at *3 (finding that a defendant did not retain a reasonable expectation of privacy in an imaged copy of a computer hard drive that the FBI had obtained through consent, as the revocation of the consent did not operate retroactively to invalidate the agents' right to copy the hard drive);

16

*see also United States v. Ponder*, 444 F.2d 816, 818 (5th Cir. 1971)[8] (stating that a valid consent to a search carries with it the right to examine and photocopy).

Here, there is no evidence of such revocation.  As the Court has already found, Defendant freely and voluntarily handed the electronic devices in his possession, including the smart phone, to the FBI agents, and consented to their search without expressing any limitation as to scope (Doc. 56 at 62-63).  *See Emanuel*, 2010 WL 11507306 at *9 (noting, *inter alia*, that "Defendant did not provide a time limit for the duration of his consent" and "did not revoke his consent").  Notably, Defendant's probation violation hearings took place in June and August of 2018.  Again, at those hearings, Defendant reaffirmed that "he voluntarily consented to the search of the devices" on May 2, 2018, and did not mention anything about revoking or limiting his consent.  (Doc. 56 at 58; *see also id.* at 27 & n.23, 31, 61.)

To the extent Defendant argues that there was unreasonable delay between May 2, 2018 (the day that Defendant consented to the search of the device) and June 26, 2018 (the day of the logical extraction of the device) and/or August 15, 2018 (the day of the physical extraction of the device), the undersigned finds this argument without merit.  Although "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of

---

[8] All Fifth Circuit decisions entered before October 1, 1981 were adopted by the Eleventh Circuit as binding precedent. *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable searches,'" *United States v. Mitchell*, 565 F.3d 1347, 1350 (11th Cir. 2009) (per curiam) (citations omitted), Defendant here waived his possessory interest in the smart phone by consenting to its search.  *See Whaley*, 415 F. App'x at 135-36 (finding, "most importantly," that defendant "essentially waived his possessory interest in the hard drive" by consenting to its search and the officers' continued possession thereof, and that any delay in searching the hard drive did not unreasonably interfere with his possessory interest); *United States v. Stabile*, 633 F.3d 219, 235 (3d Cir. 2011) (stating that "where a person *consents* to search and seizure, no possessory interest has been infringed because valid consent, by definition, requires *voluntary* tender of property")[9] (emphasis in original); *Emanuel*, 2010 WL

---

[9] In *Stabile*, the Third Circuit expressly distinguished the Eleventh Circuit's opinion in *Mitchell* by stating:

> Initially, we note that Stabile's reliance on *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009), and *United States v. Dass*, 849 F.2d 414 (9th Cir. 1988), is misplaced.  *Mitchell* and *Dass* held, respectively, that a 21-day delay and a 7- to 23-day delay between seizure and search were unreasonable when the warrantless seizures were based on *probable cause*, not consent. . . .  This distinction matters.  The *Mitchell* court carefully policed the temporal delay in obtaining a search warrant because each passing day "infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable searches.'" . . .  But where a person *consents* to search and seizure, no possessory interest has been infringed because valid consent, by definition, requires *voluntary* tender of property.

*Stabile*, 633 F.3d at 235.

11507306 at *9[10] ("Defendant's Fourth Amendment possessory interest in his computer was not infringed because he gave his consent for both the search and seizure of his computer.  . . .  Moreover, this Court cannot conclude that the fact that the Government retained the computer for approximately eleven months before completing its analysis violated Defendant's possessory interest."); *United States v. Arndt*, No. 09-00043-01-CR-W-GAF, 2010 WL 384890, *11 (W.D. Mo. Jan. 28, 2010) ("Most importantly, the officers herein had a valid consent to search the computer while at the Arndt residence . . . .  In other words, unlike *Mitchell*, the officers in this case had a right to not only seize the computer, but also to search the computer without obtaining a warrant.  . . .  There is a reason that 'consent' and 'plain view' are referred to as 'exceptions' to the Fourth Amendment requirement for a warrant."); *United States v. Murinko*, No. CR-09-027-JLQ, 2009 WL 2487042, *4-5 (E.D. Wash. Aug. 12, 2009) ("In [*United States v. Mitchell*] no consent to search was given for the hard drive that was taken, so a warrant was necessary before the search could begin.  In the case at hand, Mr. Murinko validly consented to the search of his computer.  There is no case law, and Mr. Murinko does not argue as such, indicating that law enforcement is required to obtain a search warrant once valid consent to search has been given. The agents did not need the warrant to search the computer.").

---

[10] The district court in *Emanuel* also distinguished the Eleventh Circuit's opinion in *United States v. Mitchell* "on a very key point," explaining that in *Emanuel*, "the officers did not need a warrant for the search of the computer because . . . Defendant voluntarily consented to its search."  *Emanuel*, 2010 WL 11507306 at *9.

Although there was a delay of eight to fifteen weeks, depending on which extraction the Court considers, the undersigned does not find these periods of delay to be unreasonable, considering Ms. Polidan and SA Beccaccio's credible testimony that the delay was due to backlog (III Tr. 22-23). *See Vallimont*, 378 F. App'x at 976 (noting that "the [45-day] delay was reasonable due to the 'overriding circumstances' necessitating Officer Pam Kirsch's diversion to other cases, and because the law enforcement resources of Tuscaloosa County were 'simply overwhelmed'"); *United States v. Brooks*, No. 3:13-cr-58-J-34JRK, 2014 WL 292194, *15 (M.D. Fla. Jan. 27, 2014) (finding that a delay of approximately five months between the seizure of the computers and the completion of the forensic examination was not unreasonable considering the examiners' caseload and the lack of evidence that the Government was not diligent in its efforts to complete the forensic examination); *United States v. Lovvorn*, No. 1:11-cr-208-WKW-TFM, 2012 WL 3743975, *6 (M.D. Ala. Apr. 24, 2012) (finding the nineteen-month delay between the seizure of a computer and the completion of the forensic examination was reasonably attributable to a "backlog of cases" and noting there was no evidence that the defendant sought to have his property returned or was prejudiced in any way).

As shown earlier, Defendant never requested the return of the smart phone; as such, he cannot argue that the delay adversely affected his Fourth Amendment rights. *See United States v. Johns*, 469 U.S. 478, 487 (1985) (stating that defendants who "never sought return of the property" cannot argue

that delay adversely affected Fourth Amendment rights); *United States v. Ilonzo*, Crim. File No. 1:12-CR-276-SCJ-GGB, 2015 WL 5827598, *21 (N.D. Ga. Oct. 6, 2015) (stating that "failure to seek return of evidence that was properly seized at its outset undermines a later claim that a delay in searching the property had an adverse effect of a legitimate interest").

In sum, contrary to Defendant's argument, the FBI agents did not need to seek a search warrant before commencing the search of the smart phone because Defendant consented to the search without limiting or revoking his consent.[11]  *See Thomas*, 818 F.3d at 1242 n.7 ("Because we find Olausen's consent to the forensic search was valid . . . , we need not examine whether any other warrant exception . . . would have allowed the police to search the HP computer.").

## V.    Recommendation

Based on the foregoing, it is respectfully **RECOMMENDED** that Defendant's Second Motion to Suppress (**Doc. 72**) be **DENIED**.

---

[11] To the extent Defendant's Second Motion to Suppress relies on caselaw in which the search of electronic devices was not based on consent, the Court finds those cases distinguishable.  *See, e.g., Thomas*, 818 F.3d at 1242 (finding the Supreme Court's reasoning in *Riley v. California*, 573 U.S. 373 (2014), as to the heightened privacy interest in cell phones that were called "minicomputers" when analyzing the search-incident-to-arrest rule, as "less critical" to the Eleventh Circuit's "analysis because the Supreme Court has already approved of exhaustive searches in the consent-based search context"); *United States v. Lara*, 815 F.3d 605, 612 (9th Cir. 2016) (holding that a probationer's cell phone searches were unreasonable, but expressly distinguishing the circumstances of that case from a situation in which a probationer, especially a non-violent one, has "clearly and unambiguously consented to the cell phone search").

**DONE AND ENTERED** at Jacksonville, Florida, on February 13, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record